IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATHANIEL McGHEE and ELIGA McGHEE, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PHILADELPHIA, et al., <br><br> Defendants. | CIVIL ACTION <br><br> NO. 17-832 |

MEMORANDUM RE: MOTION TO DISMISS

**Baylson, J.**                                                                   **April 18, 2024**

This case involves Plaintiffs Nathaniel and Eliga McGhee's claims under 42 U.S.C. § 1983 against numerous Philadelphia police officers ("Individual Defendants") and the City of Philadelphia. Plaintiffs allege that, under cover of policies that "white-washe[d] police paperwork," Individual Defendants "acted in concert and conspired with each other to concoct a story" that led to Plaintiffs' wrongful arrest and conviction for selling narcotics. Presently before this Court is Sergeant Joseph McCloskey's Motion to Dismiss Plaintiffs' Amended Complaint for a failure to allege McCloskey's personal involvement in any unconstitutional conduct. For the reasons explained below, McCloskey's motion is **GRANTED with prejudice**.

I.       FACTUAL BACKGROUND

Plaintiffs' Amended Complaint contains two distinct strands of allegations. ECF 27. First, the Amended Complaint alleges a decades-long history of improper policies, patterns, and practices within various narcotics units of the Philadelphia Police Department. Id. at ¶¶ 13-50. Second, it describes the circumstances surrounding Plaintiffs' alleged wrongful arrest and

conviction.  Id. at ¶¶ 51-99.  Because the present motion pertains only to Defendant McCloskey, the Court summarizes each strand of allegations in reverse order.  Likewise, the Court recounts only those alleged patterns and practices potentially relevant to McCloskey.

### A. Plaintiffs' Arrest and Wrongful Conviction

On July 18, 2007, Defendant Officer Liciardello and Defendant Lieutenant Jackson were conducting a narcotics investigation near 714 W. Wingohocking Street in Philadelphia.  Id. at ¶¶ 51-52.  As summarized in a Philadelphia Police Department Arrest Report ("PARS report"), earlier that same day, Liciardello and Jackson had received information from Defendant Detective McCusker that a "B/M named 'Snoop' was storing/selling illegal narcotics at 714 W. Wingohocking Street," and also that "'Snoop has (1) [a] sawed off shotgun & (4) handguns (1) being a Desert Eagle inside." Id. at ¶ 52.

The PARS report states that, during their investigation, Liciardello and Jackson observed both Plaintiffs exit the property, after which two unknown Black males approached Plaintiffs.  Id. at ¶ 53.  The unknown males handed Nathaniel McGhee an unknown amount of money, and Eliga McGhee "took unknown items from a pill bottle and handed" to the males.  Id. at ¶ 54.

While Plaintiffs concede that Eliga McGhee was in the general area of 714 W. Wingohocking Street, they assert that Liciardello and Jackson's claims are false, contending instead that "Nathaniel McGhee[] was not there at the time and no such transaction occurred." Id. at ¶ 55.  To support their contention of falsity, Plaintiffs note the PARS report says the unknown males who purportedly bought drugs "were not stopped" after the transaction occurred.  Id.

According to the PARS report, after the drug sale, Plaintiffs returned inside the property. Id. at ¶ 56.  They emerged a short while later, this time with their father, Nathaniel McGhee Sr. Id. at ¶ 57.  Eliga, Nathaniel, and Nathaniel Sr. then got into two different vehicles and drove away.

Id.  Liciardello and Jackson immediately provided a description of those vehicles to other officers, including Defendant Officers Reynolds and Walker.  Id.

Again, Plaintiffs contend this version of events—as summarized in the PARS report—is false.  Id. at ¶ 58.  Instead, they assert that "Nathaniel McGhee, arrived to that location in a van and [Nathaniel and Nathaniel Sr.] followed [] Eliga McGhee, who had got in another vehicle with a female."  Id. at ¶¶ 58-59.

Several other officers, including Defendant Officers Reynolds and Walker, stopped both vehicles at a nearby gas station.  Id. at ¶ 60.  As described in the PARS report, Defendant Walker "arrested Eliga McGhee (jeep) after he recovered (1) white pill bottle with label scratched off containing (17) light blue pills alprazolam & (1) clear packet heat sealed cont. (20) light blue pills alprazolam."  Id. at Exhibit C.

Plaintiffs characterize this portion of the PARS report as indicating that Defendants "recovered pills from Eliga McGhee."  Id. at ¶ 60 (emphasis added).  Here too, however, Plaintiffs assert the PARS report is a fabrication.  Id.  at ¶ 61.  Plaintiffs contend that "defendant officers did not recover the pills from [] Eliga McGee," but instead that "defendant officers recovered the pills from the female who had a prescription for them and intentionally omitted her presence from police paperwork and scratched her name off the prescription bottle."  Id. at ¶¶ 61-62.

Similarly, while the PARS report states that Individual Defendants recovered $465 from Nathaniel McGhee during Individual Defendants' simultaneous arrest of Nathaniel, Plaintiffs assert that—in actuality—Nathaniel "had more money than that which the individual defendants kept for themselves."  Id. at ¶ 63.

Based on these supposedly false allegations, Defendant Officer Reynolds obtained a search warrant for 714 W. Wingohocking Street.  Id. at ¶ 64.  In executing that warrant, Plaintiff contend

that "defendants lied by claiming they recovered from the property located at 714 W. Wingohocking Street ten (10) bags of heroin in the same kitchen cabinet drawer as a kitchen scale," along with "a loaded shotgun from the property." Id. at ¶¶ 65, 69.

Likewise, Plaintiffs assert that while "Defendant Officers claimed they recovered from inside the property letters addressed to the plaintiffs that they used for proof of residency," these letters were actually "from the vehicles, which is why the address on the letters did not match the address where they were allegedly recovered;" a "discrepancy" that defendants "intentionally omitted [] from their reports." Id. at ¶ 67. Plaintiffs similarly claim that Individual Defendants "intentionally misrepresented that the letters they reported were addressed to Plaintiff, Nathaniel McGhee, were addressed to his father, Nathaniel McGhee, Sr." Id. at ¶ 68.

Next, and pivotal to the present motion, Plaintiffs further allege that "[a]ccording to the paperwork, Defendant, P.O. Reynolds, prepared the PARS and Defendant, Sgt. McClosky, approved it as a 'supervisor.'" Id. at ¶ 70 (emphasis added). This is the only allegation in the Amended Complaint that contains a specific factual statement about McCloskey himself. Further, although there are several generalized allegations that "individual defendant officers acted in concert and conspired with each other to concoct a story for the report and to support their illegal actions," id. at ¶ 71 (emphasis added), those group allegations contain no specific factual assertions about McCloskey.

As a result, Plaintiffs were arrested and charged with selling narcotics. Id. at ¶ 72. After several years of state court proceedings—including (1) multiple instances of each Plaintiff's charges being dismissed for lack of evidence, (2) the Commonwealth choosing to refile, and (3) a mistrial due to Plaintiffs' attempting to offer evidence that Defendants were "corrupt"—Plaintiffs eventually both entered pleas of nolo contendere in March 2011. Id. at ¶¶ 73-86. In March 2015,

4

however, the Court of Common Pleas granted Plaintiffs' PCRA petitions and reversed their convictions, after which the Commonwealth withdrew prosecution. Id. at ¶ 87.

## B. Relevant Police Department Practice and Procedures

As noted above, Plaintiffs also allege a "quarter century" of improper patterns and procedures on the part of various Philadelphia Police Department narcotics units. Id. at ¶ 13.[1] While many of these earlier patterns and practices may be relevant to Plaintiffs' Monell claim against Defendant City of Philadelphia, Plaintiffs do not allege any specific conduct by McCloskey in relation to these patterns and practices.

Primarily, Plaintiffs direct this Court to "an official policy [] that help[ed] foster [police] misconduct by requiring supervisors to review all police paperwork to ensure that only officers with inculpatory information are identified." Id. at ¶ 38. According to Plaintiffs, the policy

_____

[1] Although the Court avoids a full recounting here, the Court notes that Judge Surrick recently succinctly summarized this history in Torain v. City of Philadelphia, another so-called "NFU" case involving several of the same defendants as here. 2023 WL 174951, at *1 (E.D. Pa. Jan. 12, 2023). In relevant part, Judge Surrick explained that "[i]n the late 1980s and early 1990s, the NFU of the Philadelphia Police Department (PPD) systemically violated citizens' civil rights, stole money and drugs, planted evidence on suspects, fabricated the legal basis for search and seizure warrants, and committed perjury. . . . In 1995, six NFU officers were jailed, several hundred criminal convictions were overturned, and dozens of lawsuits were commenced against the City of Philadelphia. . . . As a result of a settlement of a class action lawsuit, the City created the IAO to monitor and audit PPD policies, practices, and operations as they relate to the detection of misconduct and corruption. . . . The IAO conducted a comprehensive audit and assessment of the NFU between the years of 1997 and 2002, with its findings summarized in the 2002 Enforcement of Narcotics Laws Report. It also investigated the PPD's disciplinary system between the years of 2000 and 2002, with its findings summarized in the 2003 Disciplinary Systems Report. However, the effectiveness of the IAO in deterring police corruption and misconduct is disputed, and there is some evidence in the record of corruption, or at the very least, ineffectiveness of the IAO and Integrity and Accountability Board (IAB)." Id. at *3 (internal citations omitted). That said, this Court notes that (1) McCloskey was not a defendant in Torain, (2) Judge Surrick's recounting of the history was primarily relevant for Torain's Monell claim, and (3) Judge Surrick's distillation occurred at summary judgment, which he actually granted in favor of several individual officers. Thus, while informative context, this history is of little relevance in specific relation to Defendant McCloskey in this case.

"enforce[d] a code of silence or 'blue code,' which prohibit[ed] Officers from intervening or providing truthful information against constitutional violations and other unlawful misconduct committed by their fellow Officers."  Id. at ¶ 40.

Specifically, Plaintiffs allege that "[i]n January 2009, the Philadelphia Police Department implemented a written policy that requires supervisors to remove from all police paperwork the names of police witnesses who possess exculpatory information."  Id. at ¶ 39.  In pertinent part, that written policy states: "Platoon commanders will be required to review and initial all arrest and investigative reports, including PARS reports, to ensure that only those officers/investigators who are necessary for the successful outcome of the case are listed."  Id.; see also id. at Exhibit A.

Notably, Plaintiffs further allege the "implementation of the written policy[] just memorialized what had been an unofficial policy and/or custom of the Philadelphia Police Department at the time plaintiffs were arrested and before as indicated in the 2003 IAO Disciplinary System Report."  Id. at ¶ 42.

## II.     PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on February 22, 2017.  ECF 1.  Judge Diamond, from who the undersigned received this case, immediately marked this and a number of other narcotics unit-related cases as "closed from statistical purposes," instead relying on one "lead case" for all "pre-trial administrative purposes."  ECF 2.

On November 17, 2023, this case was reassigned from Judge Diamond to the undersigned. ECF 12.

On January 18, 2024, Defendant McCloskey filed a Motion to Dismiss for Failure to State a Claim.  ECF 21.  On January 26, 2024, Defendants Betts, Liciardello, Norman, Reynolds, Speiser, and Spicer filed a separate Motion to Dismiss.  ECF 23.

On February 16, 2024, Plaintiffs filed an Amended Complaint against all Defendants.  ECF

27.  This operative Amended Complaint asserts the following six causes of action:

1. Deprivation of liberty without due process of law and denial of fair trial by fabricating evidence, in violation of 42 U.S.C. § 1983, against Individual Defendants.

2. Deprivation of liberty without due process of law and denial of fair trial by intentionally concealing and deliberately suppressing material exculpatory and impeachment evidence, in violation of 42 U.S.C. § 1983, against Individual Defendants.

3. Malicious prosecution under the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983, against Individual Defendants.

4. Civil rights conspiracy, in violation of 42 U.S.C. § 1983, against Individual Defendants.

5. Municipal liability, in violation of 42 U.S.C. § 1983, against Defendant City of Philadelphia.

6. Malicious prosecution, in violation of the laws of the Commonwealth of Pennsylvania, against Individual Defendants.

On February 22, 2024, Defendant McCloskey filed a Motion to Dismiss this Amended

Complaint.[2]  ECF 30.  Plaintiffs responded on March 18, 2024.  ECF 34.  Defendant McCloskey

replied on March 25, 2024.  ECF 35.


## III.   LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must include

sufficient facts in the complaint that, accepted as true, "state a claim to relief that is plausible on

its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A complaint is insufficient if it

suggests only the "mere possibility of misconduct" or is a "[t]hreadbare recital[] of the elements

of a cause of action, supported by mere conclusory statements,"  and thus will not suffice if it is

---

[2] By contrast, the City of Philadelphia, along with Defendants Betts, Liciardello, Norman, Reynolds, Speiser, and Spicer, each filed Answers to the Amended Complaint on March 6 and 7, 2024, respectively. ECF 31-32.  As such, on April 1, 2024, this Court denied as moot the original Motions to Dismiss filed by (1) Defendant McCloskey, and (2) Defendants Betts, Liciardello, Norman, Reynolds, Speiser, and Spicer.

"devoid of further factual enhancement," Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (citing Twombly, 550 U.S. at 555).  Accordingly, in considering a motion to dismiss, the Court accepts all factual allegations as true and views them in a light most favorable to the plaintiff,  Doe v. Univ. of the Scis., 961 F.3d 203, 208 (3d Cir. 2020), but may not "assume that [the plaintiff] can prove facts that [she] has not alleged[,]" Twombly, 550 U.S. at 563 n.8 (citing Associated Gen. Contractors of Cal. Inc. v. Carpenters, 459 U.S. 519, 526 (1983)).

## IV.    PARTY CONTENTIONS

### A. McCloskey's Motion

In moving to dismiss Plaintiffs' Amended Complaint, McCloskey argues that "plaintiffs fail to plead [his] personal involvement in or actual knowledge . . . in any allegedly wrongful conduct." ECF 30 at 5.  As McCloskey construes the Amended Complaint, Plaintiffs' "sole factual allegation is that [] McCloskey, as a supervisor, approved the PARS Report prepared by defendant Officer Reynolds."  Id. at 7.  Accordingly, he asserts this "bare fact does not lead to the non-speculative conclusion that defendant McCloskey was aware that the contents of the report were incorrect in any way, was aware of the alleged wrongful conduct of the investigating police officers, or that he knowingly participate in a plan to wrongfully convict plaintiff."  Id.

The same rings true, McCloskey argues, for Plaintiffs' claims that "McCloskey fabricated any evidence, was aware of any exculpatory evidence, suppressed any exculpatory evidence, or knowingly provided any false information to the prosecutors which caused the prosecution."  Id.

According to McCloskey, "the only way plaintiffs are able to make this leap is by offering the conclusion that all of the individual defendants 'acted in concert and conspired with each other to concoct a story for the report and to support their illegal actions…, and to manufacture probable cause to assert in the search warrant affidavit as well as any other police paperwork.'"  Id.  Yet,

McCloskey contends, "[s]uch unsupported conclusory allegations are precisely the type that the Supreme Court has held are insufficient to overcome a motion to dismiss." Id. (citing to Iqbal, 556 U.S. at 680-81).

### B. Plaintiffs' Response

Plaintiffs counter that McCloskey's "entire argument is based upon the false premise that the Amended Complaint fails to allege that he 'was present for or participated in any of the alleged misconduct set out in the complaint.'" ECF 34 at 2. In support of this contention, Plaintiffs' brief "literally copy and paste[s] most of the factual allegations of the Amended Complaint," id. at 10, the vast majority of which do not expressly mention McCloskey. Within this lengthy set of repasted allegations, however, Plaintiffs direct this Court to the following three:

1. McCloskey approved the PARS report as a "supervisor;"

2. "[T]he individual defendant officers acted in concert and conspired with each other to concoct a story for the report and to support their illegal actions"; and

3. There was a "practice and custom of the defendant officers and other officers in the Philadelphia Police Department to secure the 'successful outcome'" by ensuring that "only those officers necessary for prosecution will be subpoenaed" pursuant to "an unwritten policy that was memorialized by Memorandum (09-01) and the Standard Operating Procedure implementing that memorandum."

Id. at 8, 11-13. In so doing, Plaintiffs make clear they are "not alleg[ing] that [McCloskey] was the other individual defendant officers' supervisor," but instead that "the PARS Report indicates" that McCloskey "approved [the report] as a supervisor.'" Id. at 8 (internal quotations omitted).[3] Plaintiffs argue the distinction is critical, because—in view of the relevant "white-washing" policies—"it can reasonably be inferred that [McCloskey] was the supervisor who was required to

---

[3] Indeed, Plaintiffs reiterate several times that "Plaintiffs did not plead moving Defendant was liable pursuant to a theory of *respondeat superior* as suggested in his brief." Id. at 10; see also id. at 8, 12.

remove from all police paperwork the names of police witnesses who possess exculpatory information in order to ensure the successful outcome of a case—*i.e.* conviction." Id. (internal quotations omitted).  Likewise, Plaintiffs assert that "[t]o ensure that no police witnesses who possessed exculpatory information would be identified in any of the police paperwork, it can reasonably be inferred that Defendant, McCloskey, had to know what really happened." Id.

### C. McCloskey's Reply

McCloskey replies, reiterating that his "name appears in only one factual averment: 'According to the paperwork, Defendant, P.O. Reynolds, prepared the PARS and Defendant, Sgt. McClosky [sic], approved it as a 'supervisor.'" ECF 35 at 1 (citing to ECF 27 at ¶ 70).  Otherwise, McCloskey contends, he is only referenced "in paragraphs identifying all of the individual defendants as police officer[s] in the Narcotics Field Unit [], and in the boilerplate paragraphs under each cause of action accusing all of the officers of generically violating plaintiffs' right." Id.

McCloskey again argues these blanket allegations are insufficient to satisfy § 1983's requirement that a plaintiff allege a "defendants' personal involvement in the alleged misconduct," which specifically "requires particular allegations of personal direction or of actual knowledge and acquiescence." Id. at 2 (citing to Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020)) (emphasis removed).  McCloskey further contends that "[a] 'group pleading' that fails to allege specific personal involvement of individuals in constitutional violations and instead makes the allegations against all defendants 'will not suffice.'" Id. (citing to Plessinger v. Primecare Med., Inc., 2024 U.S. Dist. LEXIS 44657 at *7 (M.D. Pa. Mar. 13, 2024)).

Likewise McCloskey asserts that "plaintiffs attempt to stretch the significance of defendant McCloskey's 'approval' of the arrest report 'as a supervisor' beyond all reasonable bounds." Id.

10

at 3.  He notes, for instance, that the policy on which Plaintiffs rely—which requires "supervisors to review all police paperwork to ensure that only officers with inculpatory information are identified"—was adopted in 2009, two years <u>after</u> Plaintiffs were arrested in this case.  <u>Id</u>. Similarly, McCloskey contends that even if this Court were to ignore said timeline issues, the Amended Complaint simply "does not allege that defendant McCloskey drafted the PARS report or removed anything from the PARS report."  <u>Id.</u> at 4.  Instead, it more narrowly asserts only that "defendant Reynolds prepared the PARS report and defendant McCloskey 'approved' it."  <u>Id</u>.

Thus, as McCloskey frames it, "plaintiffs base their claim on triple speculation: (1) that defendant McCloskey acted on a policy that did not yet exist; (2) that he made changes to the arrest report prepared by Officer Reynolds; and (3) that before he made those changes he found out 'what really happened' and learned of alleged constitutional misconduct."  <u>Id</u>.

## V.      DISCUSSION

To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). Where, as here, a plaintiff brings a claim against an individual defendant, a plaintiff must "make[] sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct."  <u>Chavarriaga v. N.J. Dept. of Corrections</u>, 806 F.3d 210, 222 (3d Cir. 2015).  "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  <u>Rode v. Dellaricprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).  Thus, when a complaint "fail[s] to explain … [a defendant's] involvement in any alleged constitutional violation, the court must dismiss [the] claims against them."  <u>Moore v. Russell</u>, 2023 WL 5517568, at *5 (E.D. Pa. Aug. 25, 2023).  That

11

said, the ultimate inquiry is whether a complaint contains sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant liable for the misconduct alleged." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (citing Iqbal, 556 U.S. at 678).

Several recent decisions from judges in this Court guide our analysis here.  First, in Ogrod v. City of Philadelphia, Judge Padova analyzed an exoneree-plaintiff's § 1983 claims against officers who had allegedly "coerced [a] confession, fabricated evidence, and [withheld] exculpatory evidence."  598 F. Supp. 3d 253, 259 (E.D. Pa. 2022).   Like here, three officer defendants argued that exoneree-plaintiff's "Complaint fail[ed] to allege that those Defendants were personally involved in the alleged unconstitutional conduct."  Id. at 262.  Those defendants included (1) Rock, a detective; (2) Nodif, a "sergeant and supervisor"; and (3) Washlick, a "lieutenant and supervisor."  Id. at 265.

In denying defendants' motion as to Nodif and Rock but granting it as to Washlick, Judge Padova carefully contrasted the specificity of allegations against each officer.  He noted, for instance, that plaintiff-exoneree alleged that Nodif had "reviewed the case file ..., spoke to the original investigators, went and knocked on every single door in the neighborhood to conduct neighborhood surveys, and re-interviewed people who had been interviewed in the initial investigation."  Id. (internal citations omitted).  Likewise, the complaint alleged that Rock had actively "assist[ed] in the investigation" and potentially concealed certain "type written" notes that may have exonerated the plaintiff.  Id.  By contrast, Judge Padova concluded "the allegations concerning Washlick amount[ed] to nothing more than that [Washlick] was [Nodif's] supervisor." Id.

12

On that basis, he proceeded to dismiss each claim against Washlick.  For example, on fabrication of the evidence, Judge Padova explained that because "the Complaint's only factual allegation concerning Washlick is that he was Nodiff's supervisor," there were "no factual allegations that give rise to a reasonable inference that Washlick was personally involved in the fabrication of evidence." Id. at 268.  Similarly, in dismissing plaintiff's Fourth Amendment and state law malicious prosecution claims, Judge Padova concluded that plaintiff's generalized "supervisor" allegation could "only be read as an attempt to impose liability for malicious prosecution based on respondeat superior." Id. at 266.  Lastly, and perhaps most tellingly, Judge Padova then further concluded that "[s]uch unadorned allegations" were "plainly insufficient" to support even "a plausible claim for supervisory liability." Id.

By contrast, in Wright v. City of Philadelphia, Judge Pratter denied detective-defendants' motion dismiss where defendants argued that plaintiff had "merely allege[d] [defendants] were homicide detectives at the time of the investigation and that each took witness statements implicating" exoneree plaintiff.  229 F. Supp. 3d 322, 337 (E.D. Pa. 2017).  Similar to McCloskey, detective-defendants attempted to "support their argument with cases standing for the proposition that generic allegations as to 'all defendants,' that are specific to no individual defendant, do not plausibly allege a claim for relief against specific defendants." Id. at 338.  Judge Pratter was not persuaded, concluding instead that "there [were] specific allegations, or at the very least inferences [could] be drawn based on the current allegations, that Detectives [] were each personally involved in the alleged conspiracy to frame [plaintiff] for [victim's] rape and murder." Id.  For instance, Judge Pratter noted that plaintiff had alleged that one defendant was a "lead investigator" . . . "responsible for overseeing the investigation and gathering the evidence obtained by other officers," which created a "reasonable inference [he] had actual knowledge of, or acquiesced in,

the misconduct detailed throughout the Complaint." Id.  Likewise, Judge Pratter credited the complaint's usage of "sub-groups," explaining that "while [plaintiff] will ultimately have to prove that each individual defendant violated his constitutional rights to survive summary judgment or succeed at trial, at this stage of the case, before the completion of discovery, it is sufficient for a plaintiff to identify a sub-group of defendants as responsible for particular, stated constitutional wrong." Id.

Similarly, in Crosland v. City of Philadelphia, Judge Brody denied a motion to dismiss where an exoneree had alleged that all officer defendants "either 'supervised' or 'aided in' the investigation of'" the underlying murder.  676 F. Supp. 3d 364, 379 (E.D. Pa. 2023). Specifically, Judge Brody credited the allegation that two defendants had "uncovered facts pointing to another suspect's involvement in the murder and recorded that information in the case file," and that a third had "received a document with a statement calling [a witness's] account into question and implicating a third suspect." Id.  Those allegations, Judge Brody concluded, "[struck] at the core" of the plaintiff's claim that "police ignored alternate suspects, knew (or should have known) that [a witness statement] statement implicating [plaintiff] was false, and concealed this information from prosecutors and defense counsel." Id.

Which brings us to McCloskey.  In this Court's view, Plaintiff simply has not satisfied Twombly's requirement to plead sufficient facts that "raise a right to relief [from McCloskey] above the speculative level." Dietz v. Liberty Mut. Ins. Co., 2020 WL 3414660, at *4 (E.D. Pa. June 22, 2020) (Baylson, J.) (citing to Twombly, 550 U.S. at 544); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests").  While Plaintiffs posit this case sits somewhere between

Ogrod, on the one hand, and Wright and Crosland, on the other, in reality, McCloskey's role here mirrors Washlick's role in Ogrod in all material respects.  Plaintiffs have alleged nothing more than that McCloskey signed off on the PARS report.  And, as McCloskey correctly observes, "[a]pproving a document is a far cry from editing a report."  ECF 34 at 4.   Indeed, unlike both Wright and Crosland, the Complaint here contains no additional allegations surrounding McCloskey's approval, his individualized awareness of the alleged falsehoods contained with the report, or any sort of active participation in the arrest of or investigation into Plaintiffs.

Likewise, while the Court acknowledges that Plaintiffs have alleged McCloskey may have been within a group of officers who "acted in concert and conspired with each other to concoct a story for the report," ECF 27 at ¶ 71, such an allegation is in no way analogous to the various "sub-group" contentions Judge Pratter credited in Wright.  Here, Plaintiffs have only vaguely alleged a joint malfeasance on the part of all Individual Defendants, which plainly falls within the sweep of inadequate "group allegations."  Moorehead v. Sch. Dist. of City of Allentown, 2023 WL 2976556, at *12 (E.D. Pa. Apr. 17, 2023).

Further, the Court agrees with McCloskey that the allegations regarding the narcotic unit's overarching "white washing" paperwork policies are insufficient.  To be sure, Plaintiffs have alleged the 2009 "implementation of the written policy[] just memorialized what had been an unofficial policy and/or custom of the Philadelphia Police Department at the time plaintiffs were arrested and before as indicated in the 2003 IAO Disciplinary System Report," ECF 27 at ¶ 42, potentially enabling Plaintiffs to benefit from an inference that such a policy was in effect when they were arrested in 2007.  But again, Plaintiffs simply have not alleged that McCloskey himself engaged in any type of white washing here.

In short, while Plaintiffs have had decades[4] and numerous pre- and post-trial proceedings in state court to gather facts regarding McCloskey's allegation misconduct, they allege nothing more than that McCloskey "approved" an arrest report.  Thus, this Court must conclude that Plaintiffs' Amended Complaint—as it pertains to McCloskey—is "devoid" of sufficient "factual enhancement" to survive McCloskey's motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (citing Twombly, 550 U.S. at 555).

## VI.     CONCLUSION

For the foregoing reasons, McCloskey's Motion to Dismiss is **GRANTED with prejudice.** An appropriate Order follows.

O:\CIVIL 17\17-832 McGhee v City\17cv832 Memo re MtD.docx

---

[4] In view of this elongated timeline, the Court separately notes that while McCloskey's Motion to Dismiss Plaintiffs' Amended Complaint no longer raises several statute of limitation arguments that McCloskey raised in response to Plaintiffs' initial Complaint, see ECF 21 at 5—thus rendering it unnecessary for the Court to opine on those arguments here, particularly since the Court has granted McCloskey's motion on other grounds—the Court believes similar questions may remain regarding the applicable statute of limitations for Plaintiffs' claims against remaining Defendants, who instead chose to file an Answer to Plaintiffs' Amended Complaint.